CAMPBELL PRINTING–PRESS & MFG. CO. v. MIEHLE PRINTING–
PRESS & MFG. CO.

MIEHLE PRINTING–PRESS & MFG. CO. v. CAMPBELL PRINTING–
PRESS & MFG. CO.

(Circuit Court of Appeals, Seventh Circuit. May 16, 1900.)

Nos. 634, 635.

1. PATENTS—INFRINGEMENT—PRINTING PRESSES.

The Miehle patent, No. 317.663, for improvement in machinery, consisting of a pinion operating with a rack or racks to effect a reciprocating movement, as in printing presses, etc., claim 1, which covers a combination of a rack frame and racks with a pinion provided with a wrist pin, which engages automatically into end slots for the purpose of effecting a reversal of the movement of the rack frame, discloses nothing new in the means employed except the form of the slots, by means of which the reversal is completed by a shorter movement than in prior

devices, and such claim is not infringed by machines made in accordance with the Southgate patent, No. 606,096, in which the wrist pin or its equivalent travels through a half circle to effect the reversal, as in previous forms of presses.

2. SAME.
    The Miehle patent, No. 322,309, for improvements in printing machines, *held* not infringed as to claims 1, 2, and 4.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

These appeals are from a final decree in the suit of the Miehle Printing-Press & Manufacturing Company against the Campbell Printing-Press & Manufacturing Company for infringement of the first claim of patent No. 317,663, and the first, second, and fourth claims of patent No. 322,309, issued on May 12 and July 14, 1885, to Robert Miehle. The first patent was declared valid, and further infringement enjoined. The claims of the second patent were given a narrow construction, and found not to have been infringed. 96 Fed. 226. Each company has appealed and has assigned error on the portion of the decree which is adverse to it.

The first claim of patent No. 317,663 and portions of the specification read as follows: "1. In a mechanical movement, the combination of a rack-frame and racks, with a pinion provided with a wrist-pin, which engages automatically into end slots, to properly guide the pinion with the said racks, substantially as described." "This invention relates to improvements in that class of devices consisting of a pinion operating with a rack or racks to effect a reciprocating movement for printing presses, pumps, iron planers, large church-organ bellows, and other machinery wherein a regular reciprocating movement is desired between the centers, with a slow stopping and starting movement at the centers or turning points of each reciprocating stroke. The invention consists of a mechanism by which a very slow stopping and starting movement is obtained at each end of the reciprocating movement without losing the amount of stroke heretofore lost by diminishing the revolutions of the pinion, as will hereinafter be explained. The invention also consists of a novel mechanism and arrangement of parts whereby the racks are shifted laterally of the pinion,—that is to say, parallel with the axis thereof,—to require less space in its operation; also to obviate the necessity of a counterbalance when the pinion shaft is placed in a horizontal position; and, furthermore, to obtain from a pair of racks and a pinion which has but one revolution a regular and complete reciprocating movement between its centers greater than the radius of the pinion or sweep of the wrist pin across the center, with a very slow stopping and starting movement at the end of each reciprocating stroke, the same as obtained from a crank arm and wrist pin. * * * By arranging the parts so that the pinion has an odd number of revolutions,— as one, three, and five,—only one wrist pin is required; but, when the pinion has an even number of revolutions,—as two, four, and six,—two wrist pins are necessary. * * * The diagram Fig. 13 is to show the length of stroke obtained from pinions having two, three, and four revolutions, the large pinion being proportioned the same as pinion D in the drawings, and the smaller one just one half thereof. It is evident that, when the revolutions of the pinions are diminished, the length of the stroke is also diminished, the greater amount of stroke being lost when the revolutions of the pinion are diminished from three to two revolutions for completing a reciprocating movement, and the length of stroke heretofore obtained from pinions, as shown in Fig. 13, is indicated by the dotted lines, I″, at the pitch-lines of the gears, and the dotted lines, I′, at the end of that portion representing the racks. The manner in which the present improvement obtains a stroke greater than heretofore by a pinion with two revolutions is by the additional length of the racks, C C′, which extend outwardly from the dotted lines, I′, as indicated in Figs. 1 and 6, to enter the wrist pins, E, between the end shoes, A′ A″, the ends of which are formed upon the epicycloidal curve, I, heretofore described, sufficiently to receive the wrist pins, E, properly while

the pinion is disengaging with either of the said racks, after which the shoes are shaped to impart a reduced movement to the rack frame, A, by the wrist pins, E, in time to retain the slow stopping and starting motion at the centers or turning points." "The shoes, A' A'', in the present drawings, are formed in such manner as to produce a stroke,—which is indicated by the dotted lines, l', at the end of the dotted lines, l'', in Fig. 6,—with a pinion which has two revolutions, to equal that obtained from the devices heretofore constructed, in which the driving circumference of the pinion is just one-half thereof, having four revolutions.   It is evident the length of stroke can be extended by forming the shoes, A' A'', in the manner shown in Fig. 18, the upper half of which is formed upon the epicycloidal curves, I, very near to the center or turning point, the lower half of the shoes. A' A'', being formed the same as in the main drawings.   By this arrangement a quick stopping or a slow starting movement at the centers or turning points is imparted to the rack frame, A, and in turning the pinion in an opposite direction just the reverse movement is obtained."

Fig. I.

102 F.—1]

Patent No. 322,309 is for "improvements in printing machines," and the claims in question read as follows: "(1) In a bed motion for printing presses, as herein described, in which the bed is operated by a pinion that engages alternately with top and bottom racks attached to the press bed, the combination of the operating pinion provided with a wrist pin, E, with the rack frame provided with a vertical guide slot, E', at each end, for the purpose of properly guiding the pinion into gear with the racks, essentially as set forth. (2) The combination, with the reciprocating bed of a printing press, of a rack frame having racks, C C', and vertical end slots, E' E'', driving pinion, D, provided with a wrist pin, E, and mechanism, substantially as herein described, for alternately engaging the pinion, D, with the upper and lower racks, C C', essentially as set forth. (4) The combination, with the reciprocating bed of a printing press, of a rack frame having racks, C C', and vertical slots, E' E'', driving pinion, D, carrying the wrist pin, E, said pinion being journaled at the end of a rock arm, I, and receiving a continuous rotary motion through gears, K K', and an intermittent rising and falling motion from cam, M, all combined essentially as set forth."

In the brief for the Miehle Company the following cut is given as "a picture of the entire combination or mechanism consisting of the parallel racks constituting a rack frame, the pinion with the wrist pin mounted on it, the cam for raising and lowering the pinion and maintaining it in the raised or lowered position, and the guide slots applied at each end of the rack frame"; and it is further said of it that "it embodies the subject-matter of claim 1 of the principal patent No. 317,603, and claims 1, 2, and 4 of the subordinate or improved patent No. 322,309, the specific mechanism here shown being one of those illustrated in the latter or improved patent":

The machines made by the defendant, the Campbell Company, it is conceded, conform substantially to the construction shown in letters patent No. 606,096, issued on June 21, 1898, to Louis W. Southgate, one of the counsel for that company in this litigation. In his brief, referring to the following cuts, he says of it:

"For a reversing mechanism, the defendant has rigidly secured on the face of the driving pinion, 21, a reversing pinion, 38, of one-half the diameter of the driving pinion, 21, and at each end of the bed has arranged a semi-

circular rack, 40-40, with which said pinion will engage during the time of the reverse. A large circular working shoulder or bearing, 36, is arranged on the pinion, 21, concentrically with and behind the reversing pinion, 40, to engage semicircular shoulders, 41, arranged concentrically with the curved racks, 40, carried by the bed. Projecting through the reversing pinion, 38, is a stud, 37, which engages behind rollers, 45, carried by the bed concentrically with the curved racks, 40, and shoulders, 41. The principle on which the device is arranged to work is to have a continuous engagement of gearing between the pinion and the bed during both the working and the reversing movements."

"The operation may be clearly understood from the opposite (next following) cuts. In the first figure of the cuts, the main movement to the right is just completed. The driving pinion is leaving the double rack, and the reversing pinion is just engaging one semicircular end rack. In the second of the figures, the driving pinion is shown as having made a quarter turn from the position shown in the top figure, and the movement to the right has been retarded and stopped with a crank-motion action by the reversing pinion running up the lower part of the curved rack. In the bottom of the figures the driving pinion is shown as having made another quarter turn, and as just engaging the double rack to commence the full or main working stroke to the left. During this last quarter turn the bed has been started from zero up to full working speed to the left by a crank-motion action, by the reversing pinion running up the upper part of the curved rack. In defendant's machine, instead of relying upon a wrist pin and slot for the reversing movement, the momentum of the bed is resisted and opposed by the mesh

of gearing between the circular end racks, 40, and the reversing pinion, 38. The defendant's machine secures a continuous mesh of gearing between the parts at all times, which point has been recognized for years as advantageous, if it could be properly embodied and used."

The prior art, pleaded and introduced in evidence, consists of numerous letters patent, of which the following have been treated as the more relevant: Hoe, 5,200; Campbell, 56.701: Henry, 114,557; Morse, 124,907: Cottrell, 172,974; Hoe & Tucker, 173,295; Campbell, 274,560; Potter, 260,233; Larter, 279,571; and of British patents No. 1,334, granted on May 27 1861, to Birkbeck; No. 12,690, to Welding; and No. 4,176, in 1882, to Hope. The relevant parts of the Hoe, Morse, Potter, Hoe & Tucker, and Birkbeck devices are illustrated by the following diagrams:

The Hoe Patent, No. 5,200,

The Morse Patent, No. 124,907,

Potter Patent, No. 260 233.

Hoe & Tucker patent

Birkbeck English Patent, No. 1334 .

Mr. Livermore, an expert for the defense, comparing the Hoe and Miehle movements, testified: "The mechanism of this Miehle patent differs from that of the Hoe patent mainly in the means for connecting and disconnecting the rotary and reciprocating parts that produce the reversal movement at the beginning and end of the working stroke, which in the Miehle patent is produced by the pinion and racks which are generally employed in mechanism of this kind. As shown in the Miehle patent, the two 'racks are in different planes, so that only one at a time is in mesh with the pinion, being in this respect the same as the mechanism of the Hoe patent,· but the shifting movement is effected by moving the racks laterally instead of moving the pinion, being in this respect the converse of what is employed in the mechanism of the Hoe patent. In the Miehle patent the reversal movement is effected by a revolving crank or wrist pin on the pinion or gear wheel that co-operates with the rack, but the construction is such as not to give a true crank reverse, being in this respect substantially different from the mechanism of the Hoe patent in the result produced. In the Miehle patent the crank is permanently connected with the pinion, and engages with and disengages the reciprocating part at the beginning and end of the reversal movement, being in this respect the converse of what is shown in the Hoe patent, where the crank is permanently connected with the reciprocating part, and is engaged with and disengaged from the gear wheel at the beginning and end of the reciprocating movement. In the Miehle patent the crank engages with the reciprocating part by entering a transverse slot in said part instead of connecting with a pitman, so that the movement of the crank in the direction at right angles to that of the movement produced or controlled by it is accommodated by traveling lengthwise of the slot instead of by the rocking movement of a pitman. Such connection between a crank and a reciprocating part by a slot in the reciprocating part at right angles to its part of reciprocation is a well-known equivalent for a pitman connection, and has been used as such in engines and pumps for years. If the slot employed in the Miehle device were straight, and the crank pin remained constantly in it, the revolution of the crank by the pinion would produce a back and forth reciprocation of the press bed, or part to be moved, just like the piston of a steam engine, or like what would be produced in the Hoe device if the crank pin permanently connected the pitman and rotating pinion. The problem, therefore, with this Miehle mechanism, like that involved in the mechanism of the Hoe patent, is to engage and disengage the revolving crank and reciprocating part, or, in other words, in Miehle's specific construction, to get the crank or wrist pin into and out of the slot. The construction by which this is accomplished is the sole novel or characteristic feature of the mechanism so far as the parts or elements referred to in claim 1 are concerned. The crank must enter and leave the slot at points adjacent to the racks, or, in other words, when it is at or near the diameter of the pinion that spans the space between the racks. The path of movement of the crank relative to the rack frame is a cycloid (i. e. when the racks are traveling at uniform speed in the working stroke), and, in order to effect the proper entrance of the crank into the slots, the latter are, for a portion of their length leading to the points of entrance and exit of the crank pin, formed to correspond to the path of movement of the crank relative to the rack frame, i. e. are of cycloidal shape. The result of this construction is that the uniform movement or working stroke of the reciprocating part may be continued after the engagement is effected between the crank and slot of the reversing mechanism; or, in other words, the crank travels in the cycloidal portion at the end of the slot while the reciprocating part remains in engagement with the rack, or has the same speed of movement as when in engagement with the rack, and it is only when the crank enters the straight part of the slot that the actual reversing movement begins. The complete reverse, i. e. slowing down, stopping, and starting in the reverse direction, is therefore accomplished during the movement of the crank through a very small arc instead of through a complete half circle, as is the case with a true crank reverse, such as is employed in the mechanism of the Hoe patent. The Miehle patent refers to this feature of prolonging, so to speak, the working stroke as one of the features of his improvement." On the contrary, Mr. Dayton, an expert for the complainant, after dwelling at great

length on the manifest differences between the two devices, pronounced them radically and essentially different, and declared it apparent, as he thought, that the Hoe patent and machine were "incapable of suggesting the construction and arrangement of the parts constituting the Miehle invention."

The differences between the experts in respect to the bearing of the other patents are not less radical or emphatic. Responding to the testimony of an expert for the defendant concerning the Potter patent, Mr. Dayton testified in part as follows: "The stud on the arm or disk, about which stud the rack pinion rotates, may be called properly enough a 'wrist pin,' precisely as the same stud on any crank arm or crank disk is called a 'wrist pin.' Indeed, there is where it gets its name. But this wrist pin in the Potter machine is not on the rack pinion, as called for in the Miehle patent. It is on an arm or disk, which is not the pinion, and which merely gives movable support to the pinion. In short, in the Potter machine, this wrist pin carries the rack pinion, and is not on the rack pinion for some other purpose. This is a vital and radical difference between the two machines, and as a result of this and attending differences, apparent from the foregoing description of the Potter device, the latter is radically unlike the Miehle in its composition, combination, and mode of operation. For example, I have pointed out that the Potter rack is an external rack, while the Miehle is an internal rack; that is, has its teeth directed towards each other. I will add that the Potter construction necessarily calls for an external rack. The swinging rack pinion will not work in the same way with an internal rack to give the reversals effected in this particular arrangement. The Potter device is one of its own kind, and is essentially unlike in construction, principle, and mode of operation to that of the Miehle patent. Recognizing that the prolonged stud or wrist pin on the crank disk of the Potter machine extends into semicircular end grooves or slots on the rack frame, by which means the pinion is held in engagement with the rack, and also that a portion of the outer wall of each said end grooves or slots is concerned in the reversal of the movement of the rack, said wrist pin, not being on the driving pinion, is not the wrist pin of the Miehle invention and claims in suit, and the Potter mechanical movement is not the Miehle mechanical movement, and contains no suggestion of the Miehle invention, as embodied and claimed in either of the patents sued on. * * * In the old pin-rack and star-wheel construction semicircular guides were provided outside the ends of the rack to coact with the extended shaft of the pinion, or with studs on the pinion, to hold the pinion in mesh with the end tooth of the rack during its swing up or down around said end of the rack, and sometimes these curved grooves extended in straight portions outside and parallel with the rack, between its ends, just as might be done in the case of Potter, where, however, the straight portions are omitted because the rack pinion is held in engagement by other means, to wit, to the arm or disk on which it is mounted. The Miehle invention or mechanical movement does not relate to the form of rack or rack frame to which the Potter relates and from which the Potter invention springs. On the other hand, the Miehle relates to that form of double rack where two straight racks are placed at a considerable distance from each other with their teeth towards each other, and the pinion is placed between them, requiring only such a small movement of the pinion in its own plane as will enable its teeth at one side to disengage or clear the teeth of one of the racks, while its teeth on the opposite side are engaged with the opposite rack. There is a fundamental difference between these two kinds of rack and pinion movement, as there is between races of animals. The Miehle belongs to one and the Potter to the other. Their fundamental distinctions cannot be obliterated by developments in either, and they cannot run together in underlying principle, whatever superficial and local resemblances they may appear to have."

Concerning the Hoe & Tucker patent, after explaining the construction, he testified: "The wrist pin has, therefore, a definite relation to a particular notch or gap in the pinion, and the semicircular guide at the end of the rack frame has a corresponding relation to the cylindrical end stud or pin of the rack, which is to be held engaged with this particular gap in the pinion. It is true that, inasmuch as the rising and falling pinion shaft is held from lateral displacement by the slotted upright through which it passes, this

semicircular guide at each end of the rack frame takes a small part in the reversal of the movement of the rack. That is to say, the walls in the gap of the pinion are the principal agencies concerned in the reversal of the motion of the rack, and the principal function of the wrist pin is to keep the gap in engagement with the end rack pin, that said gap may do this. At the immediate point of reversal, or immediately adjacent thereto, the pin has some office in effecting this change of movement. This fact, however, cuts no figure; in my judgment, in the determination of any question here at issue. The pin-rack and star-wheel movement, with its bodily moving pinion or star wheel sweeping through an arc whose chord is at least its own diameter, is a wholly different 'mechanical movement' from any such 'movement' involving the separated racks with their teeth directed towards each other, and having an allowably large pinion arranged between them, with a motion measured by little more than the depth of the pinion teeth. Both these types of rack and pinion movement are old and well known, and they are recognized as different types in the nomenclature of the printer's art; the type represented in the Hoe & Tucker model being known and recognized at the 'Napier Movement.' "

In the brief for the Miehle Company it is said: "The characteristic feature of this invention of Miehle's and which distinguishes it radically from all prior structures, is the use of a wrist pin upon the main pinion and slots on the rack frame to accomplish the reversal of movement of the rack frame while the pinion is wholly disengaged from, and out of mesh with, the racks. It is this feature of a complete disengagement of the pinion from the racks during reversal, and the governing of the movement at this period solely by means of the engagement of the wrist pin with the slots, which makes it possible for Miehle to obtain such a great variety of movement during reversal, either slow or fast, or both slow and fast, by simply giving different shape to the open-ended slots to suit the special requirement. This fact of complete disengagement of the pinion from the racks while the wrist pin is operating in the slot to produce the reverse distinguishes the Miehle invention from the old Napier movement of the prior art, and all of its kinsfolk, such as the English patent to Birkbeck and the others of that sort."

The court below found "that Miehle was the first to adopt the idea of the pinion, wrist pin, and end slot for the purpose of utilizing the advantages of a crank reverse in reciprocating motion; that this mechanical combination was a distinct advance in the art; and that Miehle is entitled to the benefit of the doctrine of equivalents as to these three devices to the extent of any changes in their relative size, outlines, or proportions."

Louis W. Southgate, for Campbell Printing-Press & Mfg. Co.
John W. Munday, for Miehle Printing-Press & Mfg. Co.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

WOODS, Circuit Judge, after stating the case, delivered the opinion of the court.

A patent for a "mechanical movement," according to one of the experts in the case, is "for a mechanism transmitting power or motion from a driving part to a part to be driven." Another of the experts says:

"A 'mechanical movement' is the combination and arrangement of mechanical parts intended for the translation or transformation of motion. * * * They are mechanisms adapted usually for employment in wholly different classes of machines, * * * [which] happen to require a similar resultant motion or movement of parts. * * * A claim for a mechanical movement in a patent is unrestricted to its use in any particular kind of machine, although for its proper illustration and explanation it may be shown and described in connection with such machine."

If such a movement is patentable, evidently it must be because in itself, and apart from any form of mechanism, it constitutes "a new and useful art." Rev. St. § 4886. Rejecting as surplusage, if not as meaningless, the words, "in a mechanical movement," in the claim of the first patent, and the corresponding words of the other claims in controversy, they are in the ordinary form of claims for mechanical combinations designed to accomplish the particular movements described, none of which appear to have been unknown before. There seems to be no controlling reason against considering the claims as if for mechanisms. So, in effect, the experts have treated them. Saying little or nothing in explanation of the characteristics of different movements, and pointing out no novelty of movement distinguishable from a function of mechanism, they have dwelt upon such differences of construction between devices as that the wrist pin of one is located on the driving pinion, and of another on the end of a pitman or lever, while in the first the slot is in the rack frame, and in the other is on the pinion; differences which an expert for one of the parties declares radical and essential, while the expert for the other party finds in them nothing more than a converse arrangement of parts. The difference between the "two kinds of rack and pin movement" illustrated by the patents of Miehle and Potter one of the experts has declared to be fundamental, and in a general sense the proposition is perhaps undeniable, but it has not been explained that in either device is there a new kind of movement, or a combination of the parts employed to produce the particular movements described, of which the prior art does not afford parallels either in direct or converse arrangement. It serves no purpose to emphasize the numerous differences in details of construction and operation between the earlier patents and Miehle's patent as entireties. A few elements only are involved in the issue presented. It is only with Miehle's pinion, wrist pin, rack frame, and slot, arranged to operate as stated, that we have to deal, and it is only corresponding parts of earlier patents which can aid in determining the patentability and scope of the combination. The characteristic feature of the invention, according to counsel, is the use of the wrist pin upon the main pinion and slots on the rack frame to accomplish the reversal of movement of the rack frame while the pinion is wholly disengaged from, and out of mesh with, the rack. There seems, however, to be no justification for the emphasis put upon the disengagement of the pinion from the racks. It is not a feature of the invention. It is not mentioned in the claim, and only indirectly is referred to in the specification. There was no need for more, because it is manifestly impossible that the rack frame should come under the retarding control of the wrist pin in the slot until released from the pinion, or again should come under the control of the pinion until released from the wrist pin. The invention, therefore, consists, or at least has its manifestation, in the combination of the racks, pinion, wrist pin, and slots so adjusted, for the purpose of producing a uniform reciprocal movement of the rack frame, as to guide the pinion from the point and moment of disengagement to the point and moment of re-engagement with the racks. In the means em-

ployed there was nothing new except the form of the slot. The utility or advantage achieved was that each reverse of movement was effected "without losing the amount of stroke [t]heretofore lost by diminishing the revolutions of the pinion." Theretofore the reverse was accomplished by a movement through a half circle, while by the use of the Miehle slot the reverse may be completed by a movement through an arc of any less number of degrees than 180, and thereby a proportionate increase in the length and in the movement at full speed of the racks is made practicable. The possibilities of variation in the form and operation of the slot are illustrated by Figure 18 of the patent. In these two things (the form of the slot and the greater length and movement of the rack frame) are to be found the novelty and utility necessary to support the patent. That there is nothing new and patentable in the mere arrangement and relation of the parts, one to another, seems evident. In the Hoe patent, for instance, the parts are the same, but they are placed in a converse order. The wrist pin, instead of being on the driving pinion, is on the end of a pitman or lever which is fulcrumed upon a pin or stud on the rack plate, while the slot is on the driving pinion. In form it is not a slot, but rather the equivalent of one, consisting of a recess in the periphery of the pinion or mangle wheel, into which the stud on the end of the pitman engages, and a semicircular guard plate on the pinion, which during the reversing movement, and while the pinion is entirely disengaged from the racks, holds the stud in the recess. If it be said that the equivalent of a slot is not to be found in that arrangement, then it may be equally well said that there is no slot or its equivalent in the devices of the defendant which are alleged to have been made in infringement of the Miehle patent.

The patents of Morse, Potter, Hoe & Tucker, and Birkbeck all show even more clearly combinations of rack frames, pinions, wrist pins, and slots employed, substantially, in the same manner as in the Miehle device, for the purpose of effecting the reverses necessary to the accomplishment of reciprocal movements. The essential difference is that in all the older devices the reverse is effected by the passage of the pin through a semicircular slot. The advantages of the crank movement are common to all the forms of construction referred to, but the peculiar advantage of a complete reversal of motion by the movement of a pin through less than a semicircle was left to be achieved by Miehle. For that he was probably entitled to a patent, but it follows that his patent is not infringed by any construction which, retaining the old semicircular slot, does not admit of the shortened movement which characterizes his invention.

The proof is clear that in the defendant's form of construction the reversing pinion, secured on the face of the driving pinion, and the semicircular racks at the end of the bed, may be omitted without affecting the operation of the device, and it is insisted, not without support in the evidence, that they were introduced solely for the purpose of disguising an intended infringement; but, on the construction of the patent which we are constrained to adopt, infringement is not established, because, conceding that the defendant's device

contains a wrist pin on its pinion and a slot in its rack frame, in substantially the same relation to each other as the corresponding parts of Miehle's construction, yet the slot of the defendant, like those in the earlier devices, is semicircular, and is incapable of effecting the reversal of movement in the manner characteristic of the Miehle invention. This conclusion is applicable to the claims of the other patent in suit, and makes it unnecessary to consider whether they were subject to the narrow construction given them by the court below.

The decree in respect to the first, second, and fourth claims of patent No. 322,309 is affirmed; in respect to the first claim of patent No. 317,663 it is reversed, with direction to dismiss the bill.